El Juez Asociado Señor Kolthoff Caraballo
emitió la opinión del Tribunal.
En el presente caso nos corresponde determinar si pro-cede reducir una suma acordada en una transacción celebrada entre los demandantes y unos codemandados de la cuantía total concedida como daños. Esto si, posteriormente, no se le atribuye responsabilidad en el acto torticero a los codemandados relevados por el acuerdo de transacción. Igualmente, debemos resolver si un hospital responde vicariamente por actos de impericia médica que cometió un médico contratista independiente quien trabajaba en una franquicia exclusiva que brindaba servicios de anestesiología a los pacientes de esa institución. Además, debemos considerar si procedía reducir la compensación concedida a los demandantes por los daños físicos que sufrió su hijo, porque éste estuvo inconsciente durante varios días.
*490 I
Las determinaciones de hecho esenciales son las siguientes.
A mediados de 1992, la Sra. Rita M. Deliz Cordero quedó embarazada y estuvo recibiendo tratamiento prenatal con el grupo de ginecólogos-obstetras compuesto por los doctores Arsenio Comas Urrutia, Ubaldo Catasús y Juan Figueroa Longo, bajo el cuidado principal del Dr. Comas. El embarazo fue normal y no hubo evidencia de problema con el feto durante la gestación. En la mañana del 2 de abril de 1993, la señora Deliz acude al Hospital Auxilio Mutuo (Hospital) por órdenes del Dr. Comas, por ésta estar de parto activo. Al ser examinada en el Hospital, el Dr. Comas procedió a abrirle las membranas (conocido como “romper fuente”) y el líquido amniótico reflejó presencia de meconio(1) (meconium stain). En esos momentos no se observaba progreso en el parto, por lo que el médico determinó que probablemente la señora Deliz debía ser sometida a una cesárea.
A las 11:30 a.m., como el parto no progresaba y existía desproporción céfalo pélvica, sumado a la presencia de meconio previamente detectada, el Dr. Comas decidió hacer la cesárea. Antes de realizarla no se gestionó para que durante el parto estuviera presente un pediatra u otro personal médico adiestrado, aunque se tenía conocimiento de la presencia del meconio. No hubo pediatra disponible durante el parto, aun cuando el Hospital contaba para esa fecha con pediatras y neonatólogos en su facultad médica. Durante el parto estuvo presente el personal médico siguiente: el Dr. Comas, el Dr. Miguel A. Eliza García (anestesista), una anestesista y dos enfermeras (<circulating y scrub nurse).
*491 A las 12:16 p.m. nació Miguel Alfonso, un bebé varón de 9 libras y 6 onzas, con el cuerpo cubierto de meconio. Al nacer, el Dr. Comas, conforme al procedimiento de rigor, succionó al bebé por la boca y luego por la nariz. Inmediatamente después, el bebé lloró y entonces lo entregó al Dr. Eliza. Este asumió la responsabilidad de atender al bebé, pues no había en sala otra persona con el adiestramiento y la experiencia en el manejo de un recién nacido.
El Dr. Eliza le succionó a Miguel Alfonso 4cc de meconio, le aplicó oxígeno, lo intubó endotraquealmente y utilizó un laringoscopio.(2) Además, se le otorgó un Apgar Score(3) de 7 al nacer y de 9 a los cinco minutos. Sin embargo, no surge del expediente quién o quiénes otorgaron el Apgar ni qué criterios se tomaron para adjudicar la puntuación. Durante el juicio, el Dr. Eliza testificó que fue él quién lo otorgó, debido a que el expediente médico no ofrece mucha claridad. Más bien adolece de múltiples deficiencias y crasas omisiones.(4)
*492 Al examinar al recién nacido Miguel Alfonso en el nursery, el pediatra en tumo (Dr. Sánchez) procedió a succionarlo nuevamente. Además de los 4cc de meconio que succionó el Dr. Eliza en la Sala de Operaciones, se le extrajeron 7cc de meconio del estómago y casi lee de la tráquea. Ante el riesgo de un proceso infeccioso, el Dr. Sánchez ordenó la administración de antibióticos. Sin embargo, los antibióticos fueron ordenados a la 1:00 p.m. y las enfermeras del hospital los administraron a las 3:15 p.m. No fue hasta las 3:30 p.m. cuando se cumplimentaron todas las órdenes médicas dadas.
A las 4:55 p.m. se confirmó que Miguel Alfonso tenía pulmonía. Ante este cuadro y el deterioro continuo del recién nacido, el Dr. Sánchez, en comunicación con el Dr. Jaunarena (pediatra de la familia) decidió trasladarlo al Hospital Damas en Ponce a una Unidad de Cuidado Intensivo Neonatal, ya que el Hospital Auxilio Mutuo no contaba con una para ese entonces.
A las 5:30 p.m., el Dr. Ochoa (neonatólogo) del Hospital Damas de Ponce aceptó el traslado del bebé a esa institución. Debido a que el Hospital Auxilio Mutuo no tenía protocolo para ello, no fue hasta las 7:15 p.m. que se pudo transportar a Miguel Alfonso hasta el Hospital Damas en ambulancia. Durante el viaje, el recién nacido fue acompañado por el Dr. Sánchez, una técnica de terapia respiratoria, una enfermera de intensivo y dos paramédicos.
Una vez admitido en la Unidad de Cuidado Intensivo del Hospital Damas en horas de la noche del 2 de abril de 1993, el bebé continuó recibiendo tratamiento médico. Pese a los cuidados brindados, su condición respiratoria empeoró. Ante esta situación, los médicos del Hospital Damas le aconsejaron a los demandantes que trasladaran al recién nacido a Estados Unidos, a una institución hospitalaria que tuviera una máquina especializada llamada Extra:l Corporal Membrane Oxygenation (ECMO).
*493 Así las cosas, el bebé fue trasladado en ambulancia aérea al Miami Children’s Hospital donde fue colocado en ECMO. Estuvo bajo tratamiento en el Hospital de Miami desde el 4 de abril de 1993, siendo su cuerpecito sometido a estar lleno de agujas y tubos. Además, lo mantuvieron en el área de cuidado intensivo dentro de una máquina a través de la cual se podían introducir las manos mediante unas aberturas para darle el tratamiento médico que requería. Allí, estuvo acompañado en todo momento de su padre, el Sr. Miguel Sagardía De Jesús, hasta que a su madre, la señora Deliz Cordero le fue permitido viajar y pudo acompañarlo también. Durante su estadía en dicho hospital, ambos progenitores contemplaron impotentes el deterioro de su primogénito hasta que, entre otras complicaciones, Miguel Alfonso sufrió un paro cardíaco que lo mantuvo en estado comatoso desde el 23 de abril hasta su fallecimiento el 27 de abril de 1993.
Ante esta situación, el Sr. Miguel E. Sagardía De Jesús, la Sra. Rita M. Deliz Cordero y la sociedad legal de gananciales constituida entre ellos instaron una acción por daños y perjuicios contra el Hospital y los ginecólogos-obstetras Comas Urrutia, Catasús y Figueroa Longo, además contra el anestesiólogo Eliza García. Alegó la parte demandante que, como consecuencia de las actuaciones y omisiones negligentes de la parte demandada, se produjo el fallecimiento de Miguel Alfonso veinticinco días después de su nacimiento.
Antes de comenzar el juicio, los demandantes desistieron con perjuicio de su reclamación contra los doctores Comas, Catasús y Figueroa Longo mediante un acuerdo de transacción privado. Conforme a dicho acuerdo, los demandantes exoneraron a los codemandados antes mencionados de su responsabilidad hacia éstos y los demás codemandados. Los codemandados exonerados, a su vez, se obligaron a pagar la cantidad de doscientos mil dólares a *494 los demandantes. El Tribunal de Primera Instancia dictó sentencia parcial de conformidad, permaneciendo en el pleito el Hospital y el Dr. Eliza.
Durante la discusión de la transacción en el primer día de juicio, según se desprende de la transcripción de la vista, los codemandados manifestaron en corte abierta que no interesaban reclamar partida alguna de los codemandados relevados.(5) Además, la jueza que condujo los procesos, claramente y con la anuencia de todas las partes, permitió al Hospital y al Dr. Eliza presentar prueba sobre la responsabilidad de los codemandados liberados, si así lo entendían pertinente.(6)
Celebrado el juicio, y luego de apreciar la extensa prueba desfilada y escuchar los testimonios, el tribunal declaró con lugar la demanda y condenó a los codemandados (Hospital Auxilio Mutuo y Dr. Eliza) a resarcir solidariamente a los demandantes por los daños sufridos. Determinó que era más probable que el bebé hubiera sobrevivido si hubiese recibido una atención médica más temprana de forma continua y consecuente por parte del Dr. Eliza, el personal de enfermería del Hospital y de éste como institución hospitalaria.
El tribunal concluyó que el Dr. Eliza asumió la responsabilidad del bebé al nacer y negligentemente no solicitó la presencia de un pediatra, neonatólogo, ni de ningún otro profesional. Respecto al expediente médico, concluyó que la falta de anotaciones por parte del Dr. Eliza era alarmante e injustificable. Determinó, además, que aim cuando no es inusual la presencia de meconio y su aspiración, al ser advertida es necesario hacer una intervención rápida y adecuada para lograr su mayor extracción y así evitar o disminuir los daños que pueda causar al bebé. Concluyó que si al llegar el bebé al nursery el pediatra de tumo le extrajo 7cc de meconio de su estómago y lee de su tráquea, eso fue *495 resultado de una extracción negligente por parte del Dr. Eliza.
En consecuencia, el tribunal concluyó que el Dr. Eliza fue negligente al no extraer todo el meconio aspirado por el bebé, lo que provocó daños que causaron su posterior deceso. En específico, expresó que la intervención del Dr. Eliza con el bebé fue breve, inadecuada, falta de continuidad y no documentada en el expediente médico. Respecto al Hospital, concluyó que era solidariamente responsable ante los demandantes.(7) El tribunal les condenó a pagar solidariamente $809,778.52.(8) Además, el tribunal le impuso a los demandados el pago de las costas, los gastos y los honorarios de abogado por temeridad por cuatro mil dólares e intereses al 5.25% prevaleciente.
Así, pues, según la prueba presentada, el tribunal de instancia dictaminó que los únicos responsables del evento dañoso fueron los codemandados Dr. Eliza y el Hospital. Por tal razón, aunque éstos presentaron una moción de *496 determinaciones de hecho y conclusiones de derecho adicionales, solicitando la determinación de responsabilidad de los codemandados relevados, la jueza la declaró “no ha lugar”.
El Hospital y el Dr. Eliza acudieron ante el Tribunal de Apelaciones mediante recursos de apelación separados, los cuales fueron consolidados. El Tribunal de Apelaciones emitió una extensa sentencia y después de discutir en detalle los planteamientos de los demandados, modificó la sentencia del Tribunal de Primera Instancia y señaló que el Hospital no incurrió en negligencia por tener y mantener un contrato de exclusividad con la firma de anestesiología de la cual el Dr. Eliza formaba parte, delegando en dicho grupo, sin supervisión alguna, la determinación del personal y equipo necesario en sus salas de operaciones. De igual manera, resolvió que no se estableció el nexo causal entre el daño causado y el hecho de que el Hospital no contara con un protocolo para el traslado de infantes en condición crítica a una unidad hospitalaria de cuidado terciario. No obstante, se sostuvo la determinación de solidaridad entre el Hospital y el Dr. Eliza que había hecho el Tribunal de Primera Instancia.
Asimismo, el Tribunal de Apelaciones modificó la partida de cincuenta mil dólares concedida a los demandantes por el dolor físico sufrido por su hijo a razón de dos mil dólares por 25 días y la redujo a un periodo de 17 días, para un total de treinta y cuatro mil dólares. El foro intermedio consideró que al ser una compensación sustentada en los dolores físicos del bebé, procedía la reducción de aquellos días que conforme al expediente y a la prueba presentada éste estuvo sedado y/o en estado de coma. Por consiguiente, al no sentir dolor durante ocho días, no se podía compensar por los dolores físicos no percibidos en esos días.
El Tribunal de Apelaciones también redujo del monto total de la indemnización doscientos mil dólares ya satisfecha a los demandantes por el acuerdo de transacción con *497 los codemandados relevados. Así modificada, se confirmó la sentencia apelada.
Ninguna de las partes estuvo conforme con esta sentencia, por lo cual recurrieron ante este Foro mediante sus respectivos recursos. No obstante, los recursos del Hospital Auxilio Mutuo y del Dr. Eliza no fueron acogidos por este Tribunal. Por su parte, en el recurso ante nos los demandantes plantearon los errores siguientes:
i. Cometió error el Tribunal de Apelaciones al modificar la Sentencia dictada por el Tribunal de Primera Instancia y de esa forma reducir de la cuantía concedida como daños a los demandantes-peticionarios, la suma total de la transacción entre los demandantes-peticionarios y los doctores Comas, Catasús y Figueroa Longo, amparándose en la equidad.
ii. Cometió error el Tribunal de Apelaciones al modificar la Sentencia dictada por el Tribunal de Primera Instancia y al determinar que el Hospital Auxilio Mutuo no es responsable por no contar para el 1993 con un protocolo para el traslado de infantes en condición crítica a una unidad terciaria.
iii. Cometió error el Tribunal de Apelaciones al modificar la Sentencia dictada por el Tribunal de Primera Instancia y reducir la compensación concedida a los demandantes por daños físicos experimentados por el recién nacido.
iv. Cometió error el Tribunal de Apelaciones al modificar la Sentencia dictada por el Tribunal de Primera Instancia al no imponer responsabilidad vicaria al Hospital Auxilio Mutuo por las actuaciones del doctor Eliza aún cuando se demostró que el grupo de Anestesiólogos para el que trabajaba el Dr. Eliza era contractualmente responsable por tener el personal diestro disponible que fuera necesario en sala de parto en todo momento.(9)
Estando en condiciones de resolver, procedemos a así hacerlo.
II
En cuanto al primer error, los peticionarios alegan que el Tribunal de Apelaciones erró al restar la suma producto *498 de una transacción entre éstos y unos codemandados de la cuantía total que se les concedió por daños. Tienen razón los peticionarios.
A. Los principales elementos que constituyen un contrato de transacción son: (1) la existencia de una controversia o relación jurídica incierta litigiosa; (2) la intención de las partes de sustituir —mediante la transacción— la incertidumbre sobre los elementos objetivos de la relación jurídica por otra “cierta e incontestable”, y las (3) concesiones recíprocas.(10) La antecedida incertidumbre, en la mayoría de los casos, es la causa de la transacción. Las partes, al transigir, podrían encontrarse en un estado de incertidumbre en cuanto a la razón jurídica que les asista y la ignorancia objetiva del resultado del pleito o pleito futuro. Esa incertidumbre es lo que normalmente les mueve a transigir.(11)
Por consiguiente, según el contrato de transacción, las partes sustituyen la incertidumbre con la certeza del contrato. Además, al transar, ambas partes asumen el riesgo —de haber pagado más o recibir menos— para evitar o finalizar un litigio.
B. En los casos de daños y peijuicios, la víctima puede renunciar a su reclamación con alguno de los cocausantes de un daño mediante un contrato de transacción. Además, esta situación puede ocurrir en supuestos de pluralidad de sujetos. En los últimos años hemos elucidado los efectos que produce este tipo de contrato en los supuestos de solidaridad de los pleitos de daños y peijuicios con pluralidad de sujetos. Hemos sostenido que dependiendo de lo pactado, así serán los efectos de ese acuerdo sobre el cocausante o codemandado con quien se transa y los demás que *499 permanezcan en el caso.(12) Por consiguiente, es de vital importancia establecer qué fue lo que se pactó y poder acertar el alcance de dicha transacción.(13)
Recientemente, en US Fire Insurance v. A.E.E., 174 D.P.R. 846 (2009), aclaramos la normativa acerca de los efectos de una transacción tanto en la relación interna entre codemandados solidarios como en la relación externa entre codemandados y demandantes. Expresamos que cuando la vIctima exonera de responsabilidad a uno de los codemandados, ello no acarrea el relevo de los otros codemandados, si esto ültimo no surge claramente del acuerdo de transacción.(14) Por esto, la vIctima puede continuar su reclamación contra los restantes codemandados.
Por su parte, los efectos que una transacción pueda tener en los codemandados que no transigieron dependerá de lo pactado entre el demandante y el codemandado liberado. Puede suceder que a través del acuerdo de transacción la vIctima libere a un codemandado de toda responsabilidad que pueda surgir en relación con el evento dafloso. Esta actuación se entiende como una exoneración de la responsabilidad hacia la vIctima (relación externa) asI como hacia la relación entre codemandados (relación interna). Por consiguiente, cuando esto sucede, si el codemandado liberado aceptó su responsabilidad en el evento dafloso o cuando un tribunal haga dicha determinación de responsabilidad, el principal efecto es que la vIctima asume la porción de responsabilidad que se le atribuya al cocausante liberado. (Enfasis suplido.)(15) AsI, pues, los de *500 más cocausantes del daño no podrán recobrar ninguna cantidad del cocausante liberado.(16) No está disponible la acción de nivelación porque el acuerdo de transacción exoneró al cocausante relevado de la responsabilidad interna. Por lo tanto, se le resta la porción de responsabilidad que se le atribuya al cocausante liberado para que así éstos no paguen más de lo que le corresponda.(17)
En estas circunstancias, los demás cocausantes sólo responderán por la porción que quede luego de restar el monto correspondiente a la porción de responsabilidad del cocausante liberado y no por el total de los daños.(18) Por su parte, el demandante recibirá la cantidad establecida en el acuerdo de transacción como pago del monto correspondiente a la porción de responsabilidad, si alguna, que en su día se determine para ese cocausante.(19)
Por tal razón, conforme al riesgo asumido, si al dictar la sentencia el monto correspondiente a la porción de responsabilidad del cocausante liberado es mayor a lo recibido a cambio del relevo de responsabilidad, el demandante asume dicha reducción; por el contrario, si dicha cantidad es menor a lo recibido a cambio del relevo de responsabilidad, el demandante recibe la ganancia.(20)
En este tipo de acuerdo transaccional, si luego de haber sido liberado, dicho cocausante no es encontrado incurso en responsabilidad, éste no tiene derecho a recobrar lo pagado ni los demás cocausantes a instar una acción en nivelación. El demandante en este caso recibe la ganancia.
Por otra parte, el acuerdo transaccional se puede *501 limitar a la exoneración de un cocausante en la relación externa solamente. Es decir, que el demandante renuncie a una acción de daños y peijuicios en contra de uno de los cocausantes, sin relevar a éste de los efectos que pueda tener con los restantes cocausantes. Este tipo de transacción no impide que la víctima continúe la demanda en contra de los demás cocausantes de su daño para recobrar el total del monto correspondiente a los daños causados.(21) Cuando para satisfacer la sentencia los demás cocausantes tengan que asumir la correspondiente porción del cocausante liberado y pagar una suma en exceso a la porción de responsabilidad que les corresponda, éstos tendrán disponible la correspondiente acción de nivelación.(22)
En este contexto, procede reducir de la sentencia la cantidad objeto de la transacción. De lo contrario, el demandante, sin asumir riesgo, podría recobrar el total del dinero de la sentencia, así como la cuantía obtenida mediante el acuerdo transaccional.(23) Esta actuación constituiría un escenario de enriquecimiento injusto ya que los cocausantes percibirían un empobrecimiento al pagar más de lo que les corresponde y el demandante experimentaría un enriquecimiento, sin, como señalamos, haber asumido riesgo alguno. Por consiguiente, este tipo de acuerdo transaccional que exonera sólo de la relación externa a los cocausantes liberados, tiene el efecto de mantener la acción de nivelación disponible para los cocausantes no liberados hacia los liberados.
C. Con relación a los hechos del caso de autos, en el Acuerdo Privado de Transacción (Acuerdo) que suscribieron los demandantes con los doctores Comas, Figueroa Longo y Catasús, estos últimos se obligaron a pagar doscientos mil dólares como compensación total por todo lo *502 que alegaba la parte demandante en cuanto a éstos. Aún así, los codemandados liberados expresaron que el pago del dinero no constituía una admisión de responsabilidad. Como resultado del Acuerdo, los demandantes relevaron a los doctores Comas, Figueroa Longo y Catasús de todas las reclamaciones expuestas en la demanda. Con esta actuación, se les exoneró de la relación externa entre éstos y los demandantes.
Por otro lado, el Acuerdo refleja que la intención de los demandantes fue relevar a los codemandados de la relación interna por igual. Dicho contrato de transacción refleja que los demandantes le extendieron un relevo total a los codemandados transigentes en lo que respecta a cualquier reclamo de los demás codemandados si se insta una acción de coparte.(24) Por consiguiente, el Acuerdo exoneró a los codemandados liberados tanto de la responsabilidad externa como de la interna.
En el momento en el que los demandantes liberaron a los codemandados —los doctores Comas, Figueroa Longo y Catasús— de ambas relaciones, éstos se subrogaron en sus posiciones. Al así hacerlo, el principal efecto fue que, si se le adjudicaba responsabilidad a algunos de los codemandados liberados, se le restaría a la suma concedida la porción de responsabilidad adjudicada. En este caso, los codemandados liberados no fueron encontrados responsables o cocausantes del acto torticero y, por lo tanto, nada se les po *503 día restar a los demandantes de la cantidad que recibieron como parte del contrato de transacción que suscribieron.
En US Fire Insurance v. A.E.E., supra, pág. 858, sostuvimos “que un demandante que suscribe un acuerdo transaccional con uno de los codemandados y termina recibiendo en total una cantidad mayor a lo que le corresponde, según la sentencia dictada a su favor, podrá percibir dicha ganancia, dependiendo de lo pactado en el acuerdo transaccional”. El acuerdo transaccional del presente caso demuestra que los demandantes asumieron la porción de responsabilidad que se le llegara a imputar a los codemandados liberados, por lo que asumió el riesgo de recobrar menos o más. La transacción en este tipo de casos conlleva asumir riesgos por parte de los demandantes y los codemandados liberados. Porque, como hemos mencionado, el contrato de transacción se fundamenta en la incertidumbre del litigio. Podría darse el caso en el que se encuentre responsable al codemandado liberado, y dependiendo de su respectiva porción de responsabilidad, el negocio haya sido beneficioso o no para uno o el otro. Ese es el riesgo de la transacción.
En este caso, los doctores Comas, Figueroa Longo y Catasús llegaron a un acuerdo transaccional con los demandantes y, de esta forma, evitaron el largo proceso del litigio. Estos asumieron el riesgo de pagar de más; lo que eventualmente sucedió. El Tribunal de Apelaciones en su sentencia descontó los doscientos mil dólares del total de daños concedido bajo el palio de la equidad. Sostuvo que “[d]e no deducirse dicha cuantía del monto total otorgado por el foro sentenciador constituiría una doble compensación a favor de la parte demandante respecto a la suma estipulada”.(25)
Sin embargo, entendemos que según esta normativa podemos disponer de la controversia sin tener que acudir a la *504 equidad. Además, el posible efecto de cobrar de más por el riesgo asumido en un contrato de transacción no constituye una doble compensación por el daño sufrido.
Por otro lado, sostener la decisión del foro apelativo sería beneficiar a los codemandados que no aportaron nada en la consecución del acuerdo transaccional. Ellos pagarían menos de lo que le corresponde gracias a un contrato de transacción del cual no formaron parte y por el cual no asumieron riesgo alguno. Además, permitir que el demandante perciba la ganancia en nada perjudica ni concierne a los codemandados porque éstos nada tuvieron que aportar a tal rédito y, por otro lado, ellos tienen que pagar el porciento de responsabilidad que le corresponde de todos modos.
Por ende, revocamos en lo pertinente la determinación del Tribunal de Apelaciones y sostenemos que la cantidad de doscientos mil dólares concedida por el contrato de transacción no debió ser restada de la cuantía total de daños.
i—i hH HH
En el planteamiento del segundo error, los demandantes alegan que el Tribunal de Apelaciones erró al determinar que el Hospital no es responsable por no contar para 1993 con un protocolo para el traslado de infantes en condición crítica a una unidad terciaria. No les asiste la razón.
Entre los elementos requeridos por el Art. 1802 del Código Civil,(26) se encuentra la causalidad o relación causal. Esta no se establece a base de una mera especulación o conjetura, más bien en los casos de impericia médica la causalidad se demuestra probando que la actuación del médico fue la que con mayor probabilidad causó el daño.(27)
*505 En los hechos particulares de este caso no está en controversia la responsabilidad del Hospital por la negligencia de sus empleados, que junto a la responsabilidad del Dr. Eliza y la falta del personal diestro en la Sala de Parto fueron la causa que con mayor probabilidad causó el daño. Sin embargo, de acuerdo con la prueba desfilada, quedó establecido que aunque Miguel Alfonso se encontraba en una condición delicada, éste se mantuvo estable en Ponce e incluso no fue intubado hasta el siguiente día. Además, no surge del expediente evidencia que demuestre que el traslado fue negligente ni que la ausencia del protocolo afectara a Miguel Alfonso. Por tal razón, como atinadamente concluyó el foro apelativo, los demandantes no lograron demostrar la relación causal entre la falta del protocolo para el traslado de infantes en condición crítica a una unidad terciaria y los daños.
IV
Los demandantes alegan que el Tribunal de Apelaciones erró al reducir la compensación que se les concedió por los daños físicos experimentados por su hijo. Tienen razón.
A. El Art. 1802 del Código Civil, supra, es el umbral de la responsabilidad civil extracontractual al ex-poner que “[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado”. La doctrina ha definido el daño como “todo menoscabo material o moral causado contraviniendo una norma jurídica, que sufre una persona y del cual haya de responder otra”.(28)
Intrínseco al concepto del daño se encuentran los daños patrimoniales y los no patrimoniales. El *506 daño patrimonial consiste en el menoscabo —valorable en dinero— sobre el patrimonio del perjudicado.(29) Por su parte, los daños no patrimoniales “son en principio aquellos cuya valoración en dinero no tiene la base equivalencial que caracteriza a los patrimoniales, por afectar precisamente a elementos o intereses de difícil valoración pecuniaria”.(30)
Los daños morales, en esencia, son daños no patrimoniales. Sin embargo, la doctrina ha distinguido entre los daños propiamente morales o puros y los daños morales impropios o daños patrimoniales indirectos. Los primeros son los que no producen repercusiones de carácter patrimonial; los segundos son aquellos que por medio de la “lesión de intereses inmateriales trascienden a valores del patrimonio”.(31)
Hemos señalado anteriormente que los daños morales son los infligidos a las creencias, los sentimientos, la dignidad, la estima social o la salud física o psíquica del perjudicado.(32) Por consiguiente, son aquellos que afectan principalmente los derechos de la personalidad, ya sea física o moral, del ser humano.(33) Así también, se han reconocido como daños morales las afecciones a la integridad de las facultades físicas, la privación de algún miembro o facultad de una persona, así como todo dolor físico o moral.(34)
Ahora bien, el daño moral es un concepto amplio que abarca distintas vertientes de la naturaleza humana y *507 surge de múltiples causas.(35) Como hemos señalado, dicha amplitud abarca desde el dolor físico o corporal, las angustias mentales, hasta los daños o las lesiones corporales. Si bien en muchas ocasiones se han utilizado los términos sufrimientos o daños físicos como conceptos independientes al concepto daño moral, es meritorio reconocer que éstos forman parte de dicho concepto aunque sea en vertientes diferentes.
Un acto torticero puede producir una lesión o daño corporal, el cual puede consistir desde golpes leves hasta un daño grave que produzca la muerte.(36) Este tipo de daño corporal es resarcible y ha sido reconocido como independiente dentro del daño moral.(37) Por consiguiente, una lesión a la integridad física de una persona o a sus facultades producto de un acto torticero puede ser compensable.
Por otro lado, una de las principales manifestaciones de una lesión corporal puede ser el dolor. Manifestación que podría producirse tanto en el ámbito físico como psíquico de la persona. El dolor físico “[e]s la manifestación a nivel local o general de la lesión, como consecuencia de los receptores nerviosos especializados en las distintas captaciones de estímulos”.(38) Es una sensación aflictiva por causa de una afección corporal, que se manifiesta de diversas for-mas, en la mayoría de los casos de forma perceptible. Por *508 tal razón, para una persona sentir dolor tiene que tener la capacidad de sentirlo. Así, pues, más allá del difícil proceso de cuantificar el dolor, es evidente que el dolor físico es más fácil de constatar, por estar relacionado intrínsecamente con la lesión corporal que el dolor psíquico o las angustias mentales.(39)
Por su parte, la angustia mental es la reacción de la mente y de la consciencia a un daño corporal o un evento sufrido y su impacto subjetivo en el bienestar personal.(40) Por consiguiente, la angustia mental no siempre guarda relación con un daño corporal, ya que afecta principalmente el ámbito emocional y mental del ser humano. Esta puede surgir como consecuencia directa del evento dañoso o por su efecto colateral producto del daño que sufrió otra persona.
B. Este Tribunal adoptó hace mucho tiempo que los sufrimientos físicos y mentales que padece la víctima de un hecho torticero desde que éste ocurre hasta su muerte son compensables a la víctima; por ende, al ésta morir, transmite la causa de acción a sus herederos.(41) Sin embargo, con relación a los niños recién nacidos, este Tribunal expresó que durante los primeros meses de infancia una niña no podía, como tal, sufrir daños mentales dentro *509 del significado jurídico-compensatorio.(42) Así, pues, en casos de niños de pocos meses de nacido que mueran como consecuencia de un hecho torticero, éstos sí transmiten su causa de acción sobre sus daños morales, aunque limitada, en lo correspondiente a la vertiente de los daños mentales.
C. Corresponde al juzgador, en su sano juicio, experiencia y discreción, la valoración justa y necesaria para compensar los daños y perjuicios sufridos.(43) Sin embargo, la razonabilidad debe ser la brújula que guíe al juzgador en el serpentino camino de la estimación y valoración de los daños. Así, en S.L.G. Rodríguez v. Nationwide, 156 D.P.R. 614, 622 (2002), expresamos lo siguiente:
La estimación y valorización de daños es una gestión o tarea difícil y angustiosa, ello debido al cierto grado de especulación en la determinación de éstos y por incluir, a su vez, elementos subjetivos tales como la discreción y el sentido de justicia y conciencia humana del juzgador de los hechos.(44)
La labor judicial se complica aún más en los casos de daños morales, ya que la determinación de un daño moral y su eventual compensación no es una labor mecánica ni fácil. Por tal razón, conlleva un gran esfuerzo tratar de conceder valor monetario a intereses personales que no son parte del entramado patrimonial.
Por ende, este Tribunal ha sostenido en innumerables ocasiones que se abstendrá de intervenir con la apreciación de la prueba y la determinación de daños que un foro de instancia haya emitido.(45) Así, pues, es norma clara que en deferencia y respeto a los foros de instancia, y en pro de la estabilidad, los tribunales apelativos sola *510 mente tienen la facultad de modificar las cuantías concedidas en aquellos casos en que “sean ridiculamente bajas o exageradamente altas”.(46)
D. El Tribunal de Primera Instancia concedió a los padres de Miguel Alfonso cincuenta mil dólares por los daños y sufrimientos físicos de éste. En específico, dicho tribunal sentenció:
El bebé Sagardía-Delíz en vez de ser recibido, por el calor de los brazos tiernos de sus padres, fue colocado en Tina cuna con un respirador y todo su pequeño cuerpecito tenía tubos y agujas que le fueron colocados para medicarlo y alimentarlo por los 25 días en que vivió. Ese sufrimiento físico es compensable y le otorgamos por ello una cantidad razonable a los padres en la acción heredada de su hijo por dicho concepto.(47)
Sin embargo, al final de la sentencia, la juez de instancia expuso que los cincuenta mil dólares a ambos demandantes por la causa heredada de su hijo era por el dolor físico sufrido por éste, a razón de dos mil dólares por día por veinticinco días. Así, el Tribunal de Apelaciones utilizó esta expresión para descontarle a la cuantía concedida los días que el bebé “no percibió dolor”. Dicho tribunal restó un total de ocho días de la cuantía otorgada, fundamentado en que el niño estuvo un día sin intubar, dos días sedado sin respuesta a los estímulos, y cinco días en estado de coma.(48)
Si bien es cierto que el foro primario expresó al final de su sentencia que la cuantía concedida era a razón de dos *511 mil dólares por día, lo cierto es que, según puede colegirse de la sentencia, la compensación de cincuenta mil dólares era por los daños y sufrimientos físicos de Miguel Alfonso. No sólo por los dolores físicos que sufrió, sino por el concepto más abarcador del daño moral, entre los cuales se encuentran las lesiones corporales,(49) Es evidente que el pequeño Miguel Alfonso estuvo algunos días sedado y en estado de coma como consecuencia de una afección a su integridad corporal, producto de un acto de impericia médica. Esta lesión corporal, así como su afección a su facultad de sentir, son compensables. El que una persona esté en estado de coma o sedada como consecuencia de un acto torticero, constituye una lesión corporal compensable como daño moral. Dicha compensación no se fundamenta en la percepción del dolor solamente sino, entre otras cosas, en la lesión que sufrió, la cual la mantiene en coma o imperceptible al dolor.(50)
Por ende, la cuantía concedida a los demandantes por los daños sufridos por su hijo corresponde a todos los daños morales que éste sufrió como consecuencia del acto torticero. Esa cuantía la entendemos razonable por lo que nos abstenemos de intervenir con la apreciación de la prueba y la determinación de daños que el foro de instancia hizo. En vista de lo anterior, revocamos la determinación del Tribunal de Apelaciones de reducir la cuantía concedida a los padres de Miguel Alfonso, por los daños que éste sufrió.
*512 V
Por último, los demandantes señalan como cuarto error que quedó demostrado que el grupo de anestesiólogos para el que trabajaba el Dr. Eliza tenían una responsabilidad contractual de tener el personal diestro disponible que fuera necesario en sala de parto en todo momento y, por lo tanto, se debía imponer responsabilidad vicaria al Hospital por las actuaciones del Dr. Eliza. Sin embargo, al examinar la sentencia del Tribunal de Apelaciones es claro que dicho tribunal modificó la sentencia del Tribunal de Primera Instancia al exponer que la responsabilidad era del Hospital y no del grupo de anestesiólogos.(51) Así, como muy bien sentenció el foro intermedio, la responsabilidad del Hospital era directa y no vicaria. Nos corresponde, entonces, determinar si el Hospital es vicariamente responsable por las actuaciones del Dr. Eliza.
A. No existe duda de que un hospital responde por la negligencia de sus empleados cuando cometen actos de mala práctica contra pacientes atendidos en sus instalaciones. La responsabilidad del hospital, en estos casos, se enmarca en la responsabilidad vicaria bajo el palio del Art. 1803 del Código Civil.(52) Sin embargo, con relación a los actos de impericia médica que comete un médico no empleado de un hospital, al cual la institución le concedió *513 el privilegio de utilizar sus instalaciones para atender a sus pacientes privados, este Tribunal ha establecido una clara distinción.
Si se trata de actos ocasionados por el médico a sus pacientes privados —cometidos en un hospital que el médico escogió— de ordinario el hospital no responde.(53) No obstante, el hospital podría responder por éstos médicos si incumple con alguna de las disposiciones siguientes: (a) una cuidadosa selección de los médicos a quienes les ha conferido el privilegio; (b) exigir que esos médicos se mantengan al día con cursos de mejoramiento profesional; (c) mantenerse al tanto del trabajo de esos médicos e intervenir, cuando sea posible, ante un acto obvio de impericia médica; (d) descontinuar el privilegio concedido ante repetidos o crasos actos de impericia médica de esos médicos, y (e) mantenerse razonablemente al día en cuanto a los adelantos tecnológicos disponibles.(54)
Por su parte, cuando el paciente acude al hospital y es éste el que le provee los médicos, hemos pautado que el hospital responderá solidariamente con el médico no empleado responsable del acto de impericia.(55) Esto es así, en primer lugar, porque es el hospital el que provee el servicio del médico en particular, y el paciente normalmente no decide o participa en su selección.(56) Por tal razón, “[hjasta cierto punto se puede afirmar que en esta clase de situación el hospital le está ‘garantizando’ al paciente que ese doctor, o cualquiera otro que lo atienda bajo esas circunstancias, es uno competente y apto para prestarle ayuda médica”.(57) En segundo lugar, el paciente, a quien tiene de frente es al hospital y no a los médicos en *514 particular.(58) Así, pues, el médico que trabaja en el hospital es, ante el paciente, un aparente empleado del hospital o un auxiliar del mismo. En tercer lugar, es evidente que cuando un paciente acude al hospital a recibir un servicio, la relación principal que se crea es entre éste y el paciente,(59) ya que en este contexto, el hospital no es un lugar que alberga a muchos médicos individuales, sino que es un ente que se obliga a brindar un buen servicio al paciente que allí acude. Por último, este Tribunal ha sostenido que incluso en casos en que estemos ante un contratista independiente, pero en una relación en la que el hospital “resulta principalmente beneficiado por la labor que realiza el médico”, éste deberá responder por los actos negligentes de aquél.(60)
Además, respecto a la anterior normativa, reconocimos que “no hace diferencia alguna que el doctor que atienda al paciente sea o un empleado propiamente del hospital, o uno a quien el hospital le haya concedido una ‘franquicia’ para brindar servicios médicos especializados a los pacientes del mismo, o uno que es miembro de la facultad (staff) del hospital y a quien éste llama en consulta para atender al paciente, etc.”.(61)
En relación con los escenarios de franquicias ex-clusivas —como contratos para servicios de radiología, anestesiología y servicios de salas de emergencias, entre otros— es evidente que le aplica la doctrina precedida. En este tipo de escenario usualmente el paciente no tiene participación u opción en la selección del médico o servicio en particular. Es el hospital quien provee el servicio a aquellos pacientes que acuden allí. Por consiguiente, en este tipo de situaciones, el hospital es responsable ante el pa *515 cíente conjuntamente con el médico. Se crea una garantía implícita de que es el hospital quien va a proveer el servicio y de manera competente. Sin embargo, en este tipo de situación en la cual el hospital le concede una franquicia exclusiva a un médico o a un grupo de éstos para ofrecer servicios médicos especializados a los pacientes del hospital, la institución deberá responder por los actos negligentes de éstos.
Con relación al concesionario de una franquicia exclusiva para prestar servicios de anestesiología en un hospital, ya este Tribunal ha expresado que estos concesionarios responden junto con el hospital si éste carece de equipo básico para operar la concesión adecuadamente.(62) No obstante, es preciso añadir que aunque en muchos de estos casos nos enfrentamos ante un contratista independiente, como el hospital se beneficia de la labor que realiza el médico, éste deberá responder junto con el médico por los actos negligentes que este último cometa.(63)
Ahora bien, la responsabilidad del hospital no es vicaria, sino directa, primaria e independiente, dirigida hacia el paciente. Responsabilidad que no puede evadir empleando contratistas independientes porque quien le está proveyendo el servicio y los médicos al paciente es el propio hospital. Por tal razón, ambos responderán solidariamente por el acto negligente que se cometa.
Anteriormente, habíamos reconocido que en ciertas circunstancias los hospitales podrían ser responsables por aquellos médicos que sólo gozan del privilegio de trabajar en el hospital sin ser sus empleados.(64) En esa ocasión, adelantamos que en estos casos la responsabilidad sería solidaria, sin menoscabo de la determinación de los grados de responsabilidad y el derecho a la nivelación en la *516 relación interna.(65) Por ende, si el paciente acudió al hospital, ya sea por su cuenta o por orden de su médico privado, y sufre algún daño compensable por causa de un médico contratista independiente, tanto el médico como el hospital responderán solidariamente.
B. En lo referente a la responsabilidad del Hospital sobre las actuaciones del Dr. Eliza, surge expresamente de la cláusula trigésima del contrato de exclusividad que el segundo es un contratista independiente del primero. Sin embargo, como expresamos anteriormente, el Hospital responde solidariamente por las actuaciones de éste. En este caso, la señora Deliz acude al Hospital por órdenes de su médico, pero el acto de impericia médica no lo causó dicho médico, sino el anestesiólogo Eliza, quien es un contratista independiente del Hospital. No obstante, es evidente que la señora Deliz no decidió ni participó en la selección del médico que iba a anestesiarla, y mucho menos que tendría que ser ese anestesiólogo (Dr. Eliza) quien tendría que atender a su bebé, por falta de un pediatra en la Sala de Operaciones. Por su parte, al ser operada, el anestesiólogo pasó a ser un auxiliar del Hospital y así la institución está sujeta a responder solidariamente con el médico, por los actos de éste. Así, pues, el cuarto error no se cometió.
VI
Por los fundamentos antes expuestos, se modifica la sentencia dictada por el Tribunal de Apelaciones como se indica, y así modificada se confirma.

Se dictará sentencia de conformidad.

La Jueza Asociada Señora Fiol Matta y la Juez Asociada Señora Rodríguez Rodríguez concurrieron con el resultado sin opinión escrita. El Juez Presidente Señor Hernández *517 Denton emitió una opinión concurrente en parte y disidente en parte.

 El meconio es el “material que se acumula en el intestino del feto y que forma las primeras heces del recién nacido. La presencia de meconio en el líquido amniótico durante el parto puede indicar sufrimiento fetal”. Diccionario Mosby, Medicina, Enfermería y Ciencias de la salud, 6ta ed., Madrid, Ed. Elsevier, 2003, Vol. I, pág. 997.

 Sin embargo, aunque del expediente no surge claramente de dónde se extrajeron los 4cc de meconio al bebé, el Dr. Eliza declaró en corte que extrajo el meconio del estómago. Tampoco está claro qué método se utilizó para suplirle el oxígeno, cuál fue la razón para utilizar un laringoscopio y qué resultó de su utilización, cómo se intubó al bebé y cómo se desarrolló el procedimiento. Aparecen marcadas todas las medidas de resucitación pero no se explica o detalla cuándo, cómo, cuántas veces y por qué se llevaron a cabo dichas medidas.

 El Apgar Score es una evaluación de la condición física de los niños recién nacidos al primer minuto y a los cinco minutos de nacido. Se le asigna un valor de 0 a 2 a cada uno de los cinco criterios a evaluar. Los criterios son: el ritmo cardiaco, la respiración, el tono muscular, respuesta a la estimulación y el color de piel. La puntuación máxima es de 10. El Apgar Score se utiliza para conocer la condición del recién nacido. Véase J.E. Schmidt, Attorney’s Dictionary of Medicine, LexisNexis Matthew Bender, 2003, Vol. 1A-CG, pág. A-475.

 Hay una ausencia de datos en el expediente médico que expliquen cuál fue el tratamiento médico que le brindó el Dr. Eliza al bebé en la Sala de Operaciones. No existe anotación que documente con claridad y detalle las circunstancias que rodearon el manejo y tratamiento del bebé al nacer. Tampoco indica quién ordenó su traslado de la Sala de Operaciones al Nursery. Aun cuando el Dr. Eliza administró todas las medidas de resucitación al bebé, lo que refleja una situación de cuidado, fue trasladado con un escolta al Nursery en una incubadora corriente sin personal médico. Además, quedó evidenciado que previo a su transferencia al Nursery, al menos durante diecisiete minutos, el bebé fue desatendido en la Sala de Operaciones, sin seguimiento o medidas especiales a pesar de los procedimientos o las medidas especiales de resucitación que le fueron impartidas por el Dr. Eliza.

 Véase Addendum I de la Petición de certiorari, pág. 28.

 Véase Addendum I de la Petición de certiorari.

 Entre las desviaciones principales de la mejor práctica de la medicina que cometió el Hospital, según determinó el tribunal, están las siguientes:
1. No proveer personal suficiente adiestrado en la Sala de Operaciones para atender al bebé que se conocía estaba expuesto a meconio.
2. Llevar y permitir que sus empleados cumplimentaran un expediente insuficiente con serias contradicciones y omisiones que invalidan su utilización para describir con precisión el tratamiento brindado.
3. Tener y mantener un contrato de exclusividad con la firma de anestesiología de la cual el Dr. Eliza formaba parte, delegando en dicho grupo —sin supervisión— la determinación del personal y equipo necesario en sus salas de operaciones.
4. La omisión del personal de enfermería en la Sala de Operaciones y de Recién Nacidos de reconocer la condición de cuidado que presentaba el bebé y avisar con premura al pediatra de turno para que lo atendiera.
5. La falta del personal de enfermería en seguir las órdenes médicas en un término razonable y de forma adecuada.
6. Su omisión de tener un protocolo establecido para el traslado de recién nacidos a una sala de intensivo neonatal cuando fuera necesario.

 Dicha cantidad está constituida por las partidas siguientes: ($6,867) por el costo de la ambulancia aérea; ($828.52) por los gastos de alojamiento en el Miami Children’s Hospital; ($684) por los gastos de la funeraria en Miami; ($650) por los gastos de la funeraria en Puerto Rico; ($759.00) por los gastos de pasajes aéreos; ($50,000) a ambos demandantes por la causa de acción de su hijo por el dolor físico sufrido por éste a razón de $2,000 por veinticinco días; ($350,000) por las angustias mentales sufridas por la señora Deliz en su acción directa, y ($400,000) por las angustias mentales sufridas por el señor Sagardía.

 Petición de certiorari, pág. 14.

 Art. 1709 del Código Civil, 31 L.P.R.A. sec. 4821; US Fire Insurance v. A.E.E., 174 D.P.R. 846 (2008); Mun. de San Juan v. Prof. Research, 171 D.P.R. 219 (2007).

 L.R. Rivera Rivera, El contrato de transacción: sus efectos en situaciones de solidaridad, San Juan, Jurídica Editores, 1998, pág. 37, citando a Cossío y Corral.

 US Fire Insurance v. A.E.E., supra; S.L.G. Szendrey v. Hospicare, Inc., 158 D.P.R. 648, 656 (2003); Blás v. Hospital Guadalupe, 167 D.P.R. 439 (2006).

 Art. 1714 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 4826.

 íd.; Merle v. West Bend Co., 97 D.P.R. 403, 409 (1969); S.L.G. Szendrey v. Hospicare, Inc., supra, pág. 655; Blás v. Hospital Guadalupe, supra.

 US Fire Insurance v. A.E.E., supra; S.L.G. Szendrey v. Hospicare, Inc., supra, págs. 656-659.

 US Fire Insurance v. A.E.E., supra.

 Este proceder se sostiene en el interés de evitar el enriquecimiento injusto de una parte, que es el propósito de la acción de nivelación. Id.; S.L.G. Szendrey v. Hospicare, Inc., supra, pág. 654; P.R. Fuels, Inc. v. Empire Gas Co., Inc., 149 D.P.R. 691, 712-713 (1999); Ramos v. Caparra Dairy, Inc., 116 D.P.R. 60, 63-64 (1985).

 US Fire Insurance v. A.E.E., supra; S.L.G. Szendrey v. Hospicare, Inc., supra, pág. 658.

 US Fire Insurance v. A.E.E., supra.

 íd.

 US Fire Insurance v. A.E.E., supra. Véase Blás v. Hospital Guadalupe, supra.

 íd.

 US Fire Insurance v. A.E.E., supra.

 En lo pertinente, dicho acuerdo expone en la página 5 lo siguiente:
“En la eventualidad de que el tribunal permitiera cualquier acción de coparte o de demanda de terceros contra alguno o todos los codemandados aquí comparecientes y en su día pudiera resultar que el Tribunal declarara con lugar cualquier acción de coparte o de demanda de terceros y que ello conlleve la imposición del pago de cualquier cantidad a favor del demandante de coparte o del demandante de tercero o de los demandantes; entonces los demandantes relevarán del pago de la partida que correspondiere, fuere la cantidad que fuere, a los aquí comparecientes ....
“Esto significa que los codemandados comparecientes no tendrán que pagar a la parte demandante suma adicional a la pagada a tenor con el presente acuerdo. La parte demandante a su vez renuncia a cualquier derecho que pueda tener a base de solidaridad para cobrarle a los demandados que aquí comparecen cualquier suma en exceso de la aquí acordada.”

 Apéndice de la Petición de certiorari, pág. 70E.

 31 L.P.R.A. sec. 5141.

 Rodríguez Crespo v. Hernández, 121 D.P.R. 639, 649-650 (1988).

 J. Santos Briz, Tratado de Derecho Civil, Barcelona, Ed. Bosch, 2003, T. III, pág. 457; Véanse: Ramírez Ferrer v. Conagra Foods PR, 175 D.P.R. 799 (2009); García Pagán v. Shiley Caribbean, etc., 122 D.P.R. 193, 205-206 (1988).

 H.M. Brau del Toro, Los daños y perjuicios extracontractuales en Puerto Rico, 2da ed. rev., San Juan, Pubs. J.T.S., 1986, Vol. I, pág. 428; Santos Briz, op. cit., pág. 461.

 Santos Briz, op. cit., pág. 460.

 Santos Briz, op. cit., pág. 461; J. Castán Tobeñas, Derecho civil español, común y foral, 15ta ed., Madrid, Ed. Reus, 1993, T. 4, págs. 960-951.

 Rivera v. S.L.G. Díaz, 165 D.P.R. 408, 428 (2005).

 Brau del Toro, op. cit, pág. 427.

 A. Borrell Macla, Responsabilidades derivadas de culpa extracontractual civil, 2da ed., Barcelona, Ed. Bosch, 1958, pág. 211.

 “[A]sí, por ejemplo, el dolor moral que produce la pérdida de una joya familiar; de daños morales derivados de dolores físicos o de enfermedades físicas o men-tales, y de daños morales concomitantes con daños patrimoniales o a la inversa. Todos ellos tienen de común producir perturbaciones anímicas (disgusto, desánimo, desesperación, pérdida de la satisfacción de vivir, etcétera), pero derivan de motivos distintos.” Santos Briz, op. cit., pág. 461.

 daño físico o corporal puede ser de naturaleza grave, que produzca la muerte. Incluye desde los golpes leves, laceraciones o abrasiones hasta fracturas, amputaciones de miembros, mutilaciones y daños a las estructuras óseas y a los órganos internos.” A. J. Amadeo-Murga, El valor de los daños en la responsabilidad civil, San Juan, Ed. Esmaco, 1997, T. I, pág. 223.

 Font v. Viking Construction Corporation, 58 D.P.R. 689, 711 (1941).

 B. Pérez Pineda y M. García Blázquez, Manual de valoración y baremación del daño corporal, 4ta ed., Granada, Ed. Comares, 1995, pág. 36.

 “El hombre, a diferencia del resto de los seres vivos, tiene capacidad para sentir el dolor en presente (manifestación puntual de la lesión), en pasado (recuerdo del dolor jr la lesión sufrida), y en futuro (miedo a que se repita la situación dolorosa).” íd., págs. 3-4.

 Amadeo-Murga, op. cit., pág. 224.

 Véase Yda. de Delgado v. Boston Ins. Co., 101 D.P.R. 598 (1973). Además, este Tribunal se ha expresado en varias ocasiones al respecto. En Vda. de Delgado v. Boston Ins. Co., supra, concedimos quince mil dólares a los herederos de un causante por los sufrimientos físicos y morales que padeció por tres días previos a su muerte, a causa de extensas quemaduras. Por su parte, en la decisión de Publio Díaz v. E.L.A., 106 D.P.R. 854 (1978), concedimos cinco mil dólares por los sufrimientos que enfrentaron unos esposos durante un corto periodo de tiempo antes que perecieran ahogados en las corrientes de un río. En Colón v. Municipio de Guayama, 114 D.P.R. 193 (1983), este Tribunal elevó de quince mil dólares a veinticinco mil dólares la compensación concedida a los herederos de un joven que sufrió severas y dolorosas lesiones, que lo mantuvieron diez días parapléjico antes de su muerte. En definitiva, es norma reiterada en nuestra jurisdicción que la causa de acción por daños morales es transmisible.

 Riley v. Rodríguez, 119 D.P.R. 762, 804 (1987).

 S.L.G. Rodríguez v. Nationwide, 156 D.P.R. 614, 623 (2002); Concepción Guzmán v. A.F.F., 92 D.P.R. 488, 502 (1965).

 Véanse: Nieves Cruz v. U.P.R., 151 D.P.R. 150 (2000); Rodríguez Cancel v. A.E.E., 116 D.P.R. 443, 451 (1985).

 Albino v. Ángel Martínez, Inc., 171 D.P.R. 457 (2007); S.L.G. Rodríguez v. Nationwide, supra.

 íd.

 Apéndice de la Petición de certiorari, pág. 461.

 El Tribunal de Apelaciones específicamente dijo:
“Del total concedido por el Tribunal de Primera Instancia deberán descontarse los días en que Miguel Alfonso no estuvo intubado y con tubos y agujas en todo su cuerpo, a saber el día 2. También, deberán descontarse los días en que según el récord médico del Hospital Damas el bebé estuvo sedado y no respondía a estímulos, o sea[,] los días 3 y 4. De igual forma deberán deducirse los días [en] que el niño permaneció comatoso y sin respuesta a dolor, a saber los días 23, 24, 25, 26 y 27. Todos estos suman un total de ocho (8) días por lo que solo procedería dicha partida por diecisiete (17) días a razón de $2,000.00 diarios para un total de $34,000.00.”

 Es necesario señalar que no consideramos prudente la acción de valorar los daños a base de los días en los que una persona estuvo o no en un estado de inconsciencia o comatoso, tal como lo hizo el tribunal de instancia. Más bien, opinamos que la mejor práctica sería que tal proceso se pudiera utilizar para calcular una suma única y separada que indemnice el daño objetivo de perder contacto con la realidad, por determinado tiempo, o como parte del proceso para calcular la suma general de los daños a conceder.

 por 0tr0 lado, no surge del expediente ningún tipo de prueba pericial o científica que sostenga la conclusión de que el niño no sintió dolor los días que estuvo sin intubar y sin agujas por todo el cuerpo y los días en que estuvo sedado, como sostuvo el foro apelativo en su sentencia.

 Específicamente el Tribunal de Apelaciones expuso en su sentencia lo siguiente:
“Al analizar el contrato nos percatamos que el mismo es uno referido únicamente al servicio de anestesiología y no de servicios total [es] de las salas del HOSPITAL. La exclusividad del contrato no re[levó] en ningún momento de responsabilidad al HOSPITAL de proveer el personal adiestrado y equipo necesario para la operación de sus salas. Fue erróneo del Tribunal de Primera Instancia concluir que en virtud del contrato de exclusividad Eliza era la persona responsable de proveer el personal y equipo necesario en las Salas de Operaciones. Es nuestro análisis del contrato que era el HOSPITAL quien tenía la obligación de proveer personal y equipo necesario para ofrecer los servicios de anestesiología (a excepción de los anestesistas).” (Énfasis en el original y escolio omitido.) Apéndice de la Petición de certiorari, pág. 49.

 31 L.P.R.A. sec. 5142.

 Márquez Vega v. Martínez Rosado, 116 D.P.R. 397, 408-409 (1985).

 íd., págs. 409-410.

 Márquez Vega v. Martínez Rosado, supra, pág. 407.

 íd.

 íd.

 íd.

 íd., pág. 408.

 Márquez Vega v. Martínez Rosado, supra, pág. 408.

 íd., pág. 407.

 Blás v. Hosp. Guadalupe, 146 D.P.R. 267, 323, 350 (1998).

 Márquez Vega v. Martínez Rosado, supra, pág. 408.

 Núñez v. Cintrón, 115 D.P.R. 598, 606 (1984).

 íd.